UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CINDY OLSEN,

                              Plaintiff,

       -against-

SUFFOLK COUNTY POLICE DEPARTMENT, and
SUFFOLK COUNTY

                            Defendant,
-----------------------------------------------------------------X

Docket No.: 15-4064

**COMPLAINT**

Jury Trial Demanded

    Plaintiff, CINDY OLSEN, by and through her attorneys, WHITE, RICOTTA & MARKS, P.C., allege upon knowledge as to herself and her own actions, and upon information and belief as to all other matters, as follows:

**JURISDICTION AND VENUE**

1. This action is brought pursuant to 42 U.S.C. § 1983, to redress a violation of Plaintiff's constitutional rights in the terms, conditions and privileges of employment of Plaintiff by the Defendant, as well as deprivation by the Defendant, acting under color of law, of the policies, ordinances, custom and usage of rights, privileges and immunities secured to the Plaintiff by the Fourteenth Amendment to the Constitution of the United States and all the laws and statutes thereunder, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e, *et seq.,* New York State Human Rights Law, and any other cause of action which can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked under 28 U.S.C. § 1331, the doctrine of pendant jurisdiction and aforementioned statutory provisions.

1

3. Venue is proper pursuant to 28 U.S.C. § 1391.

4. All conditions precedent to maintaining this action have been fulfilled. A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC"). On or about January 21, 2015, a Notice of Claim was filed. On or about February 23, 2015, an Amended Notice of Claim was filed. The statutory time period has passed and Defendants have not attempted to resolve this matter. A notice of a right to sue letter was issued on April 14, 2015. This action was properly commenced within 90 days of Plaintiff's receipt of said notice.

## PARTIES

5. Plaintiff, Cindy Olsen ("Cindy"), was and still is a resident of Suffolk County, State of New York.

6. Defendant, Suffolk County Police Department ("Police Department" or "Defendant"), was and still is a police department located in Suffolk County with a principal place of business at 30 Yaphank Avenue, Yaphank, New York 11980.

## FACTS

7. Cindy Olsen ("Cindy") is a female.

8. In or around October 1991, Cindy was hired by the Suffolk County Police Department ("Police Department") as a police officer and assigned to the 6th precinct.

9. In or around November 2002, Cindy was promoted to Sergeant. In or around 2006, Cindy was promoted to Community Orientated Police Enforcement (COPE) Sergeant, a highly regarded position. She currently oversees three police officers.

10. As of the present date, Cindy is the only female Sergeant in the 6th precinct.

11. Since the start of her tenure as a COPE Sergeant, Cindy has been praised for her hard work and dedication, with a glowing reputation amongst her coworkers and her superiors.

12. In or around April 2014, 6th Precinct Inspector, Thomas Palmieri, ("Palmieri"), male, ordered Cindy to be moved to a different, less desirable and prestigious office. At the time, her office was equipped with gun lockers, computers and she shared it with her partner, Steve Demeo ("Demeo"), who was on an opposite tour. Her office was a sign of prestige and she had earned her spot in that office with her hard work and dedication to her position. She was moved to her subordinates' office, forcing her to put her desk in the corner facing the wall. Her subordinate officers were also placed in this office. A male civilian research analyst was assigned to and replaced Cindy in her previous office. Demeo, however, was given his own office across the building. Moreover, Cindy was ordered to gather all of Demeo's files, his officers' files, his clothing, and his officers' clothing, organize them, and move them to the new office, without assistance, along with lockers and desks.

13. At or around the same time, Cindy's Captain, Captain Jan Rios, ("Rios") male, told Cindy that Palmieri had said that he wanted to get rid of her.

14. At or around the same time, Cindy inquired about why she was being moved and complained about the extra work involved. Rios cautioned Cindy that he was aware that there had been an intention to remove her from that unit, without explanation. Rios further cautioned Cindy that, in sum and substance, Palmieri felt that they could not have a woman off the wall, carrying on around the precinct. Similarly situated male employees, specifically Demeo, who also inquired about his office assignment, was not spoken to in a similar manner and was permitted to have his own office.

15. On or about May 26, 2014, Cindy was eating dinner with some of her coworkers at the picnic benches outside the precinct. Everett Wehr ("Wehr"), a police officer in the crime control section of the 6th precinct and a union delegate, came up behind Cindy and began massaging her neck and back. While massaging her, Wehr pressed his genitals against her back and she told him to stop, while stating, "is this supposed to be a massage? I can feel your genitals."

16. At or around the same time, Cindy often conversed with Gary Thompson, ("Thompson"), the union delegate for Cindy's subordinate police officers. Because of her interactions with Thompson, Cindy had some contact with Wehr.

17. On or about June 9, 2014, Wehr was effectively transferred to the headquarters building to the electronic investigations section, on track to earn his detective shield.

18. It is common practice in the 6th precinct to print a duty chart every day at the start of every tour, which shows the post and unit each person is assigned to. It also shows whether or not an employee is on a post by themselves or with other fellow coworkers, thus allowing members of the 6th precinct to look up where a particular coworker is stationed at any given time and whether or not that coworker is alone.

19. On or about June 23, 2014, at 6:00 p.m., Wehr appeared in Cindy's office doorway. Wehr stated he was in the building picking up some of his stuff and cleaning out his desk. Cindy was sitting at her desk area in the corner, concentrating on the preparation of materials for a presentation that evening. All of a sudden, as Cindy looked up from her work, Wehr exposed himself and put his erect penis over Cindy's shoulder at mouth level. He was holding his penis and pointing it at her. Cindy immediately covered her eyes with her hands, frightened, and hoping that, based on her response, Wehr would leave. After a period of

4

time went by, Cindy uncovered her eyes and saw that Wehr's penis was still exposed, and that he had repositioned himself so that he was standing behind her. Wehr then grabbed Cindy's right wrist hard and continued to pull as she fought to get him to release her. As a struggle ensued, he released her wrist and just continued to stand there, intimidating her. Then he suddenly lunged forward and reached down and grabbed her right wrist violently. He then slammed the back of her hand against his penis and forcibly held her hand there. After a while, he finally let her hand go. He then stood behind her, lingering, until he went to the door and, as he was exiting, said to Cindy, "I'm coming back. I'll be back. I'll visit."

20. Cindy was traumatized, terrified, and felt threatened.

21. In or around July 2014, Cindy was having a conversation with Thompson. Cindy told Thompson, in sum and substance, that something had happened with Wehr, that there was an incident in which he had done something inappropriate to her, indicating it was serious and of a sexual nature. Thompson responded, "Oh, no. What did he do now?!" throwing his hands up in the air. Rather than follow up, Thompson then stated "Never mind. I don't want to know, I have to play golf with him later this week."

22. On or about September 18, 2014, Cindy told Sergeant O'Shea, ("O'Shea") male, what had happened with Wehr. Cindy did not name Wehr specifically, but told him the sum and substance of the incident. Cindy asked O'Shea not to report the incident, as she wanted to report it when she was ready.

23. On or about September 23, 2014, Cindy was talking to Lieutenant Riggio, ("Riggio") male, a superior, but not her direct supervisor. During the conversation, Cindy revealed that there was an incident in the COPE office involving another police officer in the precinct exposing himself to her.

5

24. In September 2014, a few of Cindy's coworkers approached Rios and told him that there was something wrong with Cindy that she was not acting like herself. Rios approached Cindy and asked her what was going on. Again, Cindy did not name Wehr specifically, but told him the sum and substance of what had happened. Rios responded hostilely, "why didn't you scream?" "you're a supervisor!" "you didn't yell at him?!", "why did you wait until now to report it?!" Cindy asked Rios not to report the incident, as she wanted to report it when she was ready. In or around the same time, Rios encouraged her to come forward with the incident. Cindy expressed her concern to Rios that she was afraid to come forward and that she was afraid she was going to encounter him again. Cindy did not name Wehr specifically. Rios understood her concern and advised her that there would be backlash against Cindy if and when she names her attacker.

25. According to the Police Department Rules and Procedures, Chapter 2, Section 2: Title Rules of Conduct – Members of the Department, subsection 13 titled "General Harassment", "any member of the Department who becomes aware of such behavior ['all forms of harassing, intimidating, threatening or coercive behavior'] being directed towards the offended member, shall immediately bring this matter to the attention of a supervisor. This reporting action is mandatory, independent of the personal wishes of the offended." Thompson, O'Shea, Riggio, and Rios failed to abide by the General Harassment Policy by failing to report the incident of sexual assault and harassment committed against Cindy.

26. On or about October 6, 2014, Cindy was stationed in front of Officer Cutinella's house while he was attending his son's funeral. Cindy was by herself. Before being stationed there, Cindy had expressed concern to Rios stating, "I am really afraid that I am going to run into the guy that did this to me," as she knew her unit would be involved in funeral arrangements

6

and that Wehr could be there as Wehr and Officer Cutinella were part of the same unit. At about 2:50 pm, an unmarked car pulled up the driveway of the house and Wehr stepped out of the car. Wehr then glanced over at Cindy and whistled at her. At one point he started strutting on the front path of the house. Cindy felt threatened and panicked and immediately got into her car and locked it. Cindy called the 6th precinct to inform Rios in order to have someone replace her at her post. Rios was not there, but she was able to talk to an administrative staff member and asked her to take down the plate number. Wehr was going in and out of the house, taking food out of his car. All of a sudden, Wehr got into his car and pulled up right next to Cindy's car. He beeped the horn at her, trying to get her attention and moved his car backwards and forwards, repeatedly, taunting her. Cindy would not look at him. Wehr then sped off and was gone for a few minutes. He returned and pulled back into the driveway again. A few minutes later, Wehr again pulled his car next to Cindy's car, this time driver to driver. He put his arm on the window sill and just stared at her, taunting her and intimidating her. Cindy refused to look at him or speak to him. Wehr again sped off and did not come back.

27. As soon as another officer arrived to replace her, Cindy returned to the 6th precinct station. Later that same day, Cindy was preparing to leave for the night. She went outside to unload her police car and put items into her personal car. As she was walking back and forth, she noticed Thompson standing a few yards away from her, just staring at Cindy. Cindy found Thompson's behavior disconcerting, as they usually talk to each other and are friendly.

28. On or about October 8, 2014, Cindy was at a weekly staff meeting with Deputy Inspector Gerard McCarthy, ("McCarthy"), Rios, Riggio, Lieutenant Rowan, Detective Lieutenant Frank Catalina, ("Catalina"), and a research analyst. During the meeting, Catalina began

7

talking about sexual assault victims and that instead of police officers bringing them to the hospital, they should be brought straight to the station because advocates are known to put ideas in victims' heads and then victims lie. Upon hearing these statements, Cindy became very upset and distraught, and left to go to the bathroom. She began crying. Rios and McCarthy followed her in order to console her. They stripped Cindy of her gun. During this time, Rios told McCarthy what had happened to Cindy and Cindy revealed that it was Wehr who had sexually assaulted her. In sum and substance, McCarthy said to Cindy, "this guy is 45 years old, this is not the first time he has done this." Soon after, McCarthy left to report the incident to headquarters and talk to the police chief.

29. Subsequently, Cindy met with Rios, Vinny DiResta, ("DiResta") Cindy's union delegate, and Tim Morris, ("Morris"), the head of the union, the Superior Officers Association. No affirmative steps were taken during this meeting. Nobody discussed the incident, explained any of the procedures to Cindy, or provided any of the relevant forms to her. Instead, the purpose of the meeting was for those union personnel present to show that they were representing the union. John Cowie, 1st Vice President of the union, offered Cindy his card and told her she could contact him. Upon information and belief, DiResta was not at the meeting in his capacity to protect Cindy, but to protect O'Shea and Riggio. Following this meeting, none of the union representatives in attendance attempted to contact Cindy.

30. After this meeting, Cindy met with two criminal detectives from the Special Victims Unit, Detective Giordano and Detective Kirk. Sergeant Kelly Lynch, ("Lynch") the Departmental Designee on Sexual Harassment and a union delegate, was also present during this meeting. Towards the end of the meeting, when Cindy was explaining what Wehr had done to her, Cindy became very anxious and could not continue the meeting. The two Detectives and

Lynch brought Cindy to Dr. Farrell, a psychologist with the Police Department, and then to Stony Brook Hospital. She was diagnosed as suffering from Post-Traumatic Stress Disorder ("PTSD"). Before the trip to the psychologist, Lynch stated to Cindy, "I think there is something in the sexual harassment section that applies here. I will get back to you."

31. According to Suffolk County Police Department Rules and Procedures, Chapter 5, Section 7: Title: Sexual Harassment in the Workplace, the Departmental Designee "shall provide the employee with a Sexual Harassment Complaint Form and an Employee Rights Form." Additionally, the Departmental Designee is responsible for taking the steps necessary "to protect the employee from further sexual harassment and to ensure that appropriate investigative and disciplinary measures may be initiated without delay." Similar responsibilities and procedures are applicable to Section 8: Title: Discrimination in the Workplace.

32. Following Cindy's report of sexual assault on October 8, 2014, Cindy did not hear from Lynch nor did Lynch provide Cindy with any complaint forms or explain her rights to her. Lynch did not interview Cindy regarding the incident and did not inform Cindy that she has initiated an internal investigation. Lynch did not accompany Cindy to an October 29, 2014 meeting where Cindy gave her written statement to the criminal detectives, even after Cindy had called her asking her to accompany her. Lynch has not accompanied Cindy to any subsequent meetings, including her meeting with Suffolk County Assistant District Attorney, Kerri Kelly, which took place on November 19, 2014.

33. In or around late October 2014, O'Shea told Cindy that he and Riggio were having a conversation in which they discussed the overarching opinions of the police officers in the

precinct, that many believed "there had to be more to the story", that they could not fathom that Wehr would sexually assault her.

34. In or around December 2014, O'Shea told Cindy that he and several police officers at the precinct do not understand why she waited so long to come forward about Wehr sexually assaulting and harassing her.

35. In or around the middle of December 2014, Rios told Cindy that other supervisors did not understand why she waited so long to come forward, including Palmieri, who said in sum in substance, I don't understand why Cindy waited so long.

36. On or about December 16, 2014, over two months after revealing that she had been a victim of sexual harassment and after not receiving any forms or guidance regarding the process from the Defendant, Cindy filled out an internal correspondence form and sent it to Palmieri. The correspondence stated that she was a victim of a sexual offense and sexual harassment, that the facts of the incident were disclosed to her superiors and her union delegates on October 8, 2014, and that she has had meetings with criminal detectives from the Special Victims Unit and they are completing an investigation. The correspondence also stated that this is her attempt to be in compliance with the Police Department Rules and Procedures, Chapter 5. She also informed them that she has not received any paperwork or complaint forms and has not been advised or directed to complete or submit any paperwork.

37. On or about December 22, 2014, still having not heard from the Police Department regarding her complaint of sexual harassment, Cindy spoke to Jennifer McNamara, ("McNamara") the Director of Labor Relations of Suffolk County, regarding the lack of attention and investigation of the Police Department into her matter. McNamara was unaware of any investigation. McNamara gave Cindy the "Complainant's Report of

Harassment or Discrimination" Form, the form Lynch was obligated to give to Cindy over two months prior.

38. In or around January 2015, Cindy learned that Wehr was spreading rumors stating that he and Cindy had had a sexual relationship.

39. From October 9, 2014 until the present, Cindy has been on leave as a result of her PTSD and fear of returning to work, utilizing her saved sick leave, vacation days, personal leave days, and 202 days (type of vacation days or "chart days off"). Cindy is still receiving her pay check. By utilizing her sick days, her vacation days, and her personal leave days, Cindy is foreclosed from receiving her "SCAT check," which is a lump sum payment she would stand to receive upon retirement of all days accrued during her tenure.

40. At the beginning of her leave, Cindy informed Rios that she had been diagnosed with PTSD. As per the Suffolk County Police Department Rules and Procedures, Chapter 3, Section 2, Title: Injured Employee Reporting Procedures: a supervisor must "investigate the circumstances and facts involved in the incident" including, completing "the Injured Employee Report." Rios has not completed the Injured Employee Report nor has he assigned anyone to do so. Thus, given Rios's failure to complete such report, no report has been sent to the Medical Evaluation Unit, which would have begun the process of having Cindy receive Workmen's Compensation. Similarly situated male employees, who suffered from PTSD had the necessary paperwork filled out in order to receive Workmen's Compensation.

41. Not only is she being treated for PTSD, but she is fearful of returning to work as the Police Department has not taken any steps to discipline or suspend Wehr, or to guarantee that Cindy can "enjoy the right to work in an environment free of all forms of sexual harassment"

11

as is the written policy. Wehr's criminal actions have created "an intimidating, hostile, or offensive working environment" for Cindy. Upon information and belief, no internal investigation has been initiated, in violation of the written rules and procedures in place to combat sexual harassment and discrimination in the workplace.

42. In or around March 2015, five months after reporting her sexual assault to her employer, Lynch called Cindy and asked her to fill out a sexual harassment complaint form. Even though Cindy had submitted a sexual harassment complaint form in or around December 2014, Cindy submitted an additional complaint to Lynch in or around early April 2015. Since submitting the complaint, Cindy has not heard from Lynch nor has Lynch interviewed Cindy regarding her sexual assault and sexual harassment.

43. Based on the foregoing, Cindy alleges that the Suffolk County Police Department discriminated and retaliated against her based on her gender and her reporting of Wehr's sexual harassment in violation of Title VII of the Civil Rights Act of 1964.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

44. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

45. Defendant, while acting under color of federal law, deprived Plaintiff of her constitutional rights, as secured by the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983. The Defendant has intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights in that the Defendant's custom or practice of discriminating and/or retaliating against

Plaintiff due to Plaintiff's sex to perpetuate, without abatement, in violation of Plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

46. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint. Title VII of the Civil Rights Act of 1964 provides that

    a. It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

47. As described above, Defendant has subjected Plaintiff to discrimination based on her sex and maintained a hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER FEDERAL LAW

48. Plaintiff repeats, reiterates, and realleges each and every allegation in the above paragraphs of this complaint. Title VII of the Civil Rights Act of 1964 provides that

    a. It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

49. As described above, the Defendant retaliated against Plaintiff by failing to to conduct a reasonable investigation into her complaint of sexual harassment or guarantee a work place free of sexual harassment in response to her opposing discriminatory practices in violation of Title VII of the Civil Rights Act of 1964.

### AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

50. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint. New York State Human Rights Law provides that

    a. It shall be an unlawful discriminatory practice: (1) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

51. As described above, Defendant's actions are in violation of the New York State Human Rights Law.

### AS AN FIFTH CAUSE OF ACTION FOR DISCRIMINATION FOR THE NEW YORK STATE HUMAN RIGHTS LAW

52. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

53. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

54. As detailed above, the Defendant retaliated against Plaintiff in violation of the New York State Executive Law § 296.

14

WHEREFORE, Plaintiff demands judgment against Defendant, where applicable, for all compensatory, punitive, emotional, and physical damages, lost pay, front pay, injunctive relief, and any other damages permitted by law. Plaintiff demands a trial by jury.

Dated: Long Island City, New York
July 10, 2015

Respectfully submitted,

WHITE, RICOTTA & MARKS, P.C.
Attorneys for Plaintiff
3110 37th Avenue, Suite 401
Long Island City, New York 11101
(347) 464-8694

_____/s_____
JAMIE HAAR